**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Jhon Nigel Brisken, | No. CV 16-02434-PHX-JJT (ESW) |
| Plaintiff, | |
| v. | **ORDER** |
| Unknown Griego, et al., | |
| Defendants. | |

Plaintiff Jhon Nigel Brisken, who is currently confined in the Saguaro Correctional Center ("SCC") in Eloy, Arizona, brought this civil rights action pursuant to 42 U.S.C. § 1983. Pending before the Court is Magistrate Judge Eileen S. Willett's unopposed Report and Recommendation ("R&R"), recommending dismissal of Defendant Beard without prejudice (Doc. 86), and the following four Motions: (1) Defendants Thomas and Griego's Motion for Summary Judgment on Counts II and III (Doc. 91), (2) Defendant Gilreath's Motion for Summary Judgment on Count I (Doc. 93); (3) Plaintiff's "Motion to Have Copys (sic) Made of the Grievances Submitted to the Court and Forwarded to the Arizona Medical Board" (Doc. 165); and (4) Plaintiff's "Motion for an Extension of Time Before Any Judgment is Made on Summary Jud[g]ement" (Doc. 167). Plaintiff was informed of his rights and obligations to respond to the Motions for Summary Judgment pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) (Docs. 96, 97), and he opposes the Motions. (Docs. 101, 102, 103.)

The Court will accept the R&R, grant the Motions for Summary Judgment, deny as moot Plaintiff's Motion for Copies and Motion for Extension, and dismiss this action.

## I. Background

On screening of Plaintiff's Third Amended Complaint ("TAC") under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated an Eighth Amendment medical care claim in Count I against Defendant Doctors Beard and Gilreath,[1] an Eighth Amendment conditions of confinement claim in Count II against Defendants SCC Warden T. Thomas and Assistant Warden B. Griego, and a Fourteenth Amendment due process claim in Count III against Defendants Thomas and Griego and directed all Defendants to answer the claims against them. (Doc. 19.)

## II. R&R

Magistrate Judge Willett issued an R&R recommending that Defendant Beard be dismissed without prejudice for failure to effect timely service pursuant to Rule 4(m). (Doc. 86.) No objection has been filed in response, which relieves the Court of its obligation to review the R&R. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003). The Court will adopt the R&R and dismiss Defendant Beard without prejudice.

## III. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

---

[1] This Defendant's name is alternately spelled "Gilwrath" in the TAC and the Court's screening Order; the Court herein adopts the spelling used in Defendant Gilreath's Answer. (*See* Doc. 30.)

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

**IV.  Plaintiff's Responses/Verified Complaint**

Plaintiff was informed of the requirements of a response to the Motions for Summary Judgment, and he filed multiple documents in which he appears to respond collectively to both Motions. (*See* Docs. 101, 101-1, 102, 103.) But Plaintiff failed to comply with the Court's instructions and the applicable Federal and Local Rules in responding to the Motions, including that he must (1) provide a separate statement of facts, containing numbered paragraphs corresponding to the numbered paragraphs in Defendants' statements of fact, stating whether he disputes the asserted facts, and (2) cite to "the specific admissible portion of the record" supporting his position. (*See* Docs. 96 & 97 at 2−3; LRCiv 56.1(b).)

Although Plaintiff numbered his paragraphs, his numbering does not appear to correspond to the numbering in Defendants' Statements of Fact, and Plaintiff wholly failed to cite to any evidence in the record to support his position. Accordingly, where relevant, the Court will construe Plaintiff's verified Complaint as an affidavit in opposition to Defendants' Motions. *See Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (allegations in a pro se plaintiff's verified pleadings must be considered as evidence in opposition to summary judgment); *Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995) (verified complaint may be used as an affidavit opposing summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence). Where Defendants' facts are not clearly contradicted by Plaintiff's allegations in the TAC or other evidence in the record, the Court will consider the facts undisputed.

## V. Defendants Thomas and Griego's Motion for Summary Judgment

### A. Facts

Plaintiff is part of a population of Hawaii Department of Public Safety ("HDPS") inmates housed at SCC pursuant to a contract between CoreCivic, which operates SCC, and the HDPS. (Doc. 92 (Defs.' Statement of Facts) ¶¶ 1−3.) Plaintiff is a "mental health inmate" who suffers from various mental health issues.[2]

Defendant Thomas has been the Warden at SCC since 2017,[3] and Defendant Griego has been the Assistant Warden at SCC since 2007. (*Id.* ¶¶ 4−5.)

---

[2] Plaintiff alleges that he suffers from Paranoid Schizophrenia and Bipolar Disorder, but there is no evidence in the record showing he was diagnosed with these conditions, what his symptoms are, if he is being treated or medicated for these conditions, or to what extent his conditions/treatment affect his daily functioning.

[3] Defendants state, in reliance on CoreCivic's publicly-accessible website, that Defendant Thomas "return[ed] to SCC as Warden" in 2017. (Doc. 92 ¶ 4.) Defendants' statement is vague as to what role Defendant Thomas had prior to "return[ing]" to SCC, and the website information simply states that Thomas "was named warden at [SCC] in 2017"; although it provides lengthy additional facts about Thomas' prior roles, it does not state whether Thomas was already working at SCC in another role immediately prior to becoming Warden or that he had worked at SCC at an earlier time, as Defendants' statement implies. *See CoreCivic "Facility Leader: Todd Thomas, Warden,"*

CoreCivic Policy 10-1, entitled Segregation/Restrictive Housing Unit Management, sets forth policies governing inmates assigned to disciplinary segregation at SCC. (*Id.* ¶ 10.) Inmates assigned to segregation are also subject to the disciplinary policies and procedures in Policies 15-1 and 15-2, which set forth SCC's offense and penal code and its disciplinary procedures. (*Id.* ¶ 11.)

Policy 10-1, Section 4(A)(4), limits the amount of personal property inmates in segregation are permitted to have in their cells to the items on CoreCivic's Authorized In-Cell Property List. (*Id.* ¶ 12.) Items not on this list are placed in storage until the inmate is released from segregation into the general prison population. (*Id.*) Also, under Policy 10-1, Section 4(B)(1), a Shift Supervisor or someone with higher authority may impose additional restrictions on an inmate's personal property, if deemed necessary, based on an individual assessment of the inmate. (*Id.* ¶ 13.) The factors to consider before imposing these "special handling requirements" include, but are not limited to, the inmate's (a) security level, (b) past disciplinary history, and (c) continued disruptive behavior. (*Id.*)

Policy 10-1, Section 4(I)(3) provides that inmates may also be placed on temporary "property restriction" as necessary, meaning that certain personal items may be temporarily removed from an inmate's cell if they are deemed a threat to inmate safety or facility security. (*Id.* ¶ 14.) Additional provisions allow staff to restrict inmates' recreation, telephone privileges, visitation, and utility/cell furnishings, as the situation requires, for legitimate penological reasons. (*Id.* ¶¶ 15−18.) Policy 10-1 does not require a hearing prior to placing a restriction on an inmate in the segregation unit. (*Id.* ¶ 18.) When imposing a property restriction, SCC staff must complete a 10-1E Confinement Activity/Service Restriction form and forward it to the Chief of Security, Unit Management, and the Warden for approval and provide a copy to the inmate. (*Id.* ¶ 19.) Restrictions under Policy 10-1, Section 4(I), may only be imposed by an Administrative Duty Officer ("ADO") unless

http://www.corecivic.com/facilities/saguaro-correctional-center (last visited March 7, 2019).

immediate action is warranted, in which case the Shift Supervisor may impose a restriction on a temporary basis, subject to final approval by an ADO. (*Id.* ¶ 20.)

When an inmate is placed on property restriction, all items listed on the Authorized In-Cell Property List are removed from the cell, including the inmate's mattress and bed linens, while the inmate typically retains his shirt and boxer shorts. (*Id.* ¶ 21.) Inmates on property restriction are typically provided toilet paper, which is only removed if an inmate is found using it in an inappropriate manner, such as for clogging an in-cell toilet, at which point it is only provided when needed. (*Id.* ¶ 24.) The inmate's mattress and bed linens are typically returned from 11:00 p.m. until 5:00 a.m. daily, and the property restrictions typically last seven days, after which the Unit Manager or other authorized staff member reviews whether to remove or continue the restriction. (*Id.* ¶¶ 21−23.)

On approximately November 4, 2014, Plaintiff was placed in disciplinary segregation after pleading guilty to C12-Hindering for delaying a face-to-photo count and to B9-Use of Vulgar, Abusive, or Obscene Language for using vulgar language toward an officer. (*Id.* ¶ 25; Doc. 92-1, Ex. A (Griego Decl.) ¶ 25.) Per policy, Plaintiff was permitted to keep with him the items delineated on the Authorized In-Cell Property List. (*Id.* ¶ 26.) Plaintiff was again placed in disciplinary segregation on February 8, 2015, pending a disciplinary hearing and guilty finding for threatening and hindering staff. (*Id.* ¶ 27.) He remained in segregation until April 9, 2015, after which he was returned to the general population. (*Id.*)

Plaintiff was again sent to disciplinary segregation from November 3, 2015 to January 1, 2016, and from July 18, 2016 until at least 30 days after July 25, 2016, after being given hearings and found guilty of the following disciplinary offenses: (1) on November 3, 2015, threatening a staff member and sexual misconduct; (2) on July 18, 2016, destruction of property; (3) on July 21, 2016, refusing to take down an obstruction from his bunk; and (4) on July 25, 2016, use of obscene language while refusing to uncover his head. (*Id.* ¶¶ 28−29, 34−36, 71.)

During the periods that Plaintiff was in disciplinary segregation, he was additionally placed on property restriction for a total of 7 days from July 21 to 28, 2016. (*Id.* ¶¶ 35, 63.)[4] This restriction stemmed from Plaintiff's refusal to take down an obstruction from his bunk. (*Id.* ¶ 36.) In the early morning hours of July 21, 2016, Lt. Burns reported to Defendant Griego that Plaintiff had refused to take down an obstruction from his bunk that was blocking the staff's view of Plaintiff and compromising their ability to conduct inmate counts and welfare checks. (Griego Decl. ¶ 32.) Lt. Burns told Griego that he and other staff gave Plaintiff several verbal directives to take down or move the obstruction to keep the head portion of his bunk clear and unobstructed, but Plaintiff responded only by yelling obscenities at Lt. Burns. (*Id.* ¶¶ 33−34.) Based on this report and Plaintiff's "long history of refusing orders, including refusing to uncover his head," Griego placed Plaintiff on property restriction at 4:30 a.m. to prevent Plaintiff from causing further disruption. (*Id.* ¶¶ 34−36.) The Confinement Activity/Service Restriction Form issued by Griego shows that Plaintiff was "to not have any property in his cell. He can only be in a t-shirt and boxers. He can have his mattress, blanket and sheet from 11:00 p.m. to 5:00 a.m." (Doc. 92-1 at 17.) Plaintiff was not given a hearing prior to the restriction or a way to appeal the sanction. (Doc. 18 at 5.)

Plaintiff testified in his Deposition that he was placed on property restriction "for just having a t-shirt hanging off the bunk." (Doc. 92-1, Ex. B (Pl. Dep.) at 30:24−31:4.) He stated that he was upset with Lt. Burns because the t-shirt did not block the view of his

---

[4] In the TAC, Plaintiff alleges that he was placed on property restriction "a few times in November 2016" after having verbal disputes with SCC staff. (Doc. 18 at 4.) This assertion is too vague to show precisely when or how many times Plaintiff was placed on property restriction, and it fails to create a question of fact as to the evidence Defendants present showing only that Plaintiff was placed on property restriction for one 7-day period in July 2016. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) ("[c]onclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment"); *Nilsson v. City of Mesa*, 503 F.3d 947, 952 n.2 (9th Cir. 2007).

entire body, and he argued with Lt. Burns, saying "You can see me. Why are you making a big deal over a t-shirt draping off the top bunk?" (*Id.* at 31:12−24.)

According to Griego, "staff must have an unobstructed view of all inmates when conducting their walks and welfare checks. They must be able to see a living, breathing person." (Griego Decl. ¶ 37.) Therefore, when an inmate covers his head, "staff cannot properly observe the inmate and cannot complete the welfare checks without incident." (*Id.*) Additionally, if the inmate continues to refuse to uncover, correctional officers (COs) may be required to make a forced entry into the cell, which requires them to physically subdue all occupants and compromises the safety and security of staff and inmates. (*Id.* ¶ 38.) Griego opines that "[b]y placing [Plaintiff] on property restriction and removing the personal property items he was using to obstruct staff's view, we were able to temporarily prevent [Plaintiff] from further disruptions and avoid conflicts with staff." (*Id.* ¶ 39.)

While Plaintiff was on property restriction, all his property listed on the Authorized In-Cell Property List, except for his t-shirt and boxer shorts, was removed during the day, but between 11:00 p.m. and 5:00 a.m., he was allowed a mattress, two sheets, and one blanket, giving him 6 hours access to these items during sleeping hours. (*Id.* ¶¶ 50−52.) On the first day, Plaintiff was given a roll of toilet paper by one of the COs, but this was later taken away, and Plaintiff "on occasions" had no toilet paper. (Doc. 92 ¶¶ 56−57; Doc. 18 at 4.)[5] In his Deposition testimony, Plaintiff states that he asked for toilet paper "a couple of times" but was told to wait because the COs were busy, and after they took his roll of toilet paper back he "cleaned [him]self with water." (Doc. 29-1. Ex. B. (Pl. Dep.) at 35:18−22; 36:9−19.) Plaintiff continued to receive all his meals, the opportunity to shave and shower at least three times per week, basic hygiene items, and recreation for one hour

---

[5] Defendant Griego testifies that Plaintiff had access to toilet paper, but his testimony appears to be based solely on CoreCivic's policy requiring that inmates be given toilet paper, so long as they do not use it improperly, and not on personal knowledge about what occurred in Plaintiff's case. (*See* Griego Decl. ¶ 42.) A declaration used to support summary judgment must be made on personal knowledge. Fed. R. Civ. P. 56(c)(4).

a day, five days a week. (Doc. 92 ¶58.) Per policy, he was also able to have legal and social visits, receive library services, make telephone calls, and have access to legal materials upon request. (*Id.* ¶¶ 59−60.) He was also able to request and complete various request forms, including grievance forms, and to make sick calls. (*Id.* ¶ 61.)

While in his cell, Plaintiff had access to a working toilet and was not in restraints. (*Id.* ¶ 62.) The temperature in the housing unit was kept at 70 degrees Fahrenheit. (*Id.* ¶ 65.) Plaintiff describes being in "cold ventilated air" and having "to go underneath the bunk to avoid the force of the vent," which was at the "roof of the cell," and that going underneath the bunk caused him to injure his tailbone. (Doc. 18 at 4.) He also "caught a terrible cold from attempting to remain warm and such cold air blowing." (*Id.*)

After Plaintiff's property restriction was lifted on July 28, 2016, all of Plaintiff's personal property was returned to his cell. (*Id.* ¶¶ 64−65.) Being placed on property restriction should not affect the duration of Plaintiff's sentence. (Griego Decl. ¶ 48.)

In addition to being placed on property restriction, Plaintiff received an Inmate Disciplinary Report on July 21, 2016 for Failure to Follow and Use of Obscene Language when he refused to uncover his head, and he was found guilty of these offenses on July 25, 2016, at which time he received 30 days disciplinary segregation for his conduct. (*Id.* ¶ 50; Doc. 92-1 at 19−21.) Plaintiff admits that Defendant Thomas did not place him on property restriction or have any personal involvement in that decision on July 21, 2016. (Doc. 92-1 at 43.)

**B.    Eighth Amendment Conditions of Confinement Claim**

The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners from inhumane conditions of confinement. *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 847 (1994) and *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). While conditions of confinement may be, and often are, restrictive and harsh, they must not involve the wanton and unnecessary infliction of pain. *Morgan*, 465 F.3d at 1045. Prison officials have a duty to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care, and

personal safety. *See Farmer*, 511 U.S. at 832; *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996); *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982).

To prevail on an Eighth Amendment conditions-of-confinement claim, plaintiffs must meet a two-part test. "First, the alleged constitutional deprivation must be, objectively, sufficiently serious" such that the "official's act or omission must result in the denial of the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotations omitted). Second, the prison official must have a "sufficiently culpable state of mind," i.e., he must act with "deliberate indifference to inmate health or safety." *Id.* (internal quotations omitted). Deliberate indifference is a higher standard than negligence or lack of ordinary due care for the prisoner's safety. *Id.* at 835. To be found liable for denying a prisoner humane conditions under the Eighth Amendment, a prison official must both know of and disregard an excessive risk to inmate health and safety. *Id.* at 837. As to the knowledge component, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and* he must also draw the inference." *Id.* (emphasis added).

### 1. Defendant Thomas

Defendants argue that Plaintiff's claim against Defendant Thomas fails at the outset because Defendant Thomas did not "return as Warden of SCC until 2017," after Plaintiff's 7-day period of property restriction had already taken place, and Plaintiff admits that Defendant Thomas had no involvement in or knowledge of Plaintiff's restrictions. (Doc. 91 at 10.) As previously noted, Defendants facts are vague as to when Defendant Thomas worked at SCC. At most, the evidence they cite shows only that Defendant Thomas was appointed Warden of SCC in 2017, not whether he had any role at SCC immediately prior to that or was at SCC at some earlier time, which may have included the time of Plaintiff's property restriction. Plaintiff's admission that Defendant Thomas did not place him on property restriction or have any personal involvement in the decision to do so on July 21, 2016 is also not competent evidence of Defendant Thomas' lack of involvement because

it is not clear that Plaintiff would have personal knowledge of whether Defendant Thomas participated in this decision.

Nonetheless, the lack of any specific allegations about Defendant Thomas' actions in the TAC—or any other evidence in the record that Defendant Thomas knew of and disregarded Plaintiff's alleged injuries—is fatal to Plaintiff's Eighth Amendment claim, which requires a showing that Defendant Thomas both knew of and deliberately disregarded substantial threats to Plaintiff's health or safety. Plaintiff also admits in his Response that Defendant Thomas was not at SCC at the time Plaintiff was on property restriction. (Doc. 101-1 at 6.) He then argues that Defendant Thomas should still be held liable for Plaintiff's alleged injuries because Defendant Thomas "oversees the prison," and he should be "held accountable for Griego's actions." (*Id.*) But this also is not a basis to hold Defendant Thomas liable. There is no respondeat superior liability under § 1983, and therefore, a defendant' s position as the supervisor of persons who allegedly violated Plaintiff's constitutional rights does not impose liability. *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691-92 (1978); *Hamilton v. Endell*, 981 F.2d 1062, 1067 (9th Cir. 1992); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). "Because vicarious liability is inapplicable to § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. "A plaintiff must allege facts, not simply conclusions, that show that an individual was personally involved in the deprivation of his civil rights." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998).

Absent any facts showing that Plaintiff can satisfy the subjective component of his Eighth Amendment claim against Defendant Thomas, this claim fails as a matter of law. Accordingly, the Court will grant Defendants' Motion for Summary Judgment as to Defendant Thomas and dismiss Defendant Thomas with prejudice.

## 2. Defendant Griego

Defendants argue that Plaintiff cannot meet the objective component of his deliberate indifference claim against remaining Defendant Griego because none of the

conditions Plaintiff endured while on property restriction were "sufficiently serious" that he was deprived of "the minimal civilized measure of life's necessities," and Plaintiff's property restriction was imposed for the legitimate governmental objective of maintaining security and order, not unnecessarily to cause pain. (Doc. 91 at 6−7.) They also argue that Plaintiff cannot establish the subjective component of this claim because there is no evidence Defendant Griego was aware that Plaintiff suffered serious harm and was deliberately indifferent to such suffering. (*Id.* at 9−10.)

### a. Cold Temperature/Lack of Clothing, Blankets

The Eighth Amendment guarantees prisoners "adequate heating," but not necessarily a "comfortable" temperature. *Graves v. Arpaio*, 623 F.3d 1043, 1049 (9th Cir. 2010) (quoting *Keenan*, 83 F.3d at 1091). "One measure of an inadequate, as opposed to merely uncomfortable, temperature is that it poses 'a substantial risk of serious harm.'" *Graves*, 623 F.3d at 1049 (quoting *Farmer*, 511 US. at 834)).

Defendants argue that being in a 70-degree climate-controlled environment in only boxer shorts and a t-shirt for 7 days did not violate Plaintiff's Eighth Amendment rights because Plaintiff was not stripped of all clothing, the deprivation was only temporary, and 70 degrees is a reasonable temperature. (Doc. 91 at 7) (citing *Garland v. Stanley*, No. 1:12-CV-01755-AWI, 2015 WL 1513635, at *5 (E.D. Cal. Mar. 30, 2015) ("[T]emporarily depriving an inmate who remains inside of clothing or blankets does not rise to the level of an Eighth Amendment violation if temperatures are moderate.")).

Given the evidence that the temperature in Plaintiff's housing unit was climate-controlled at 70 degrees, Plaintiff's bald reference to the "cold ventilated air" in his cell suggests only that the temperature was uncomfortable to Plaintiff, not that it was so cold that it posed a substantial threat to his health. Plaintiff's claim that he caught a terrible cold from the temperature is also merely speculative and too conclusory to show that the temperature caused him harm. Absent more specific facts or medical evidence to support this assertion, Plaintiff fails to create a genuine issue of material fact that the temperature

in his cell was objectively sufficiently serious to give rise to an Eighth Amendment violation.

Plaintiff's related contentions about the forcefulness of the cold air coming out of the ceiling vent—which he claims compelled him to retreat under his steel bunk to escape, whereby he injured his tailbone—create a genuine issue of material fact that the blowing air, compounded by Plaintiff's lack of full clothing and only semi-available bedding, was objectively sufficiently serious to support an Eighth Amendment claim, at least during the times the air was blowing and Plaintiff had no blankets or other means to cover himself. But even inferring in Plaintiff's favor that the force of the cold air from the ceiling vent was inhumane, and taking as true that Plaintiff at some point injured his tailbone from crawling underneath his steel bunk to escape the blowing air, Plaintiff provides no evidence that he ever complained to Defendant Griego or any other prison staff about the cold, blowing air in his cell. Thus, even if a reasonable jury could find in Plaintiff's favor on the objective component of his deliberate indifference claim on this issue, absent any evidence that Defendant Griego was aware of the blowing air issue, these facts are insufficient to support the subjective component of that claim.

### b. Limited Mattress/Bedding

The Ninth Circuit has held that being made to sleep "without a mattress for only one night is insufficient to state an Eighth Amendment violation." *Hernandez v. Denton*, 861 F.2d 1421, 1424 (9th Cir. 1988), *cert. granted, judgment vacated on other grounds,* 493 U.S. 801, 110 S. Ct. 37, 107 L. Ed. 2d 7 (1989). This Court has also found that requiring a prisoner to sleep on a cold, hard floor without a mattress or blanket for 7 days, resulting in muscle-aches and difficulty sleeping, was insufficient to constitute an Eighth Amendment violation where the prisoner was under contraband surveillance watch (CSW) for purportedly hiding drugs in his anus, but he continued to receive adequate shelter, food, clothing, and medical care. *See Centeno v. Wilson*, No. 1:08-CV-1435-FJM, 2011 WL 836747, at *1−*3 (E.D. Cal. Mar. 4, 2011), *aff'd,* 479 F. App'x 101 ("9th Cir. 2012) ("The

limited deprivation of a mattress, blanket, and shower under the circumstances of this case is insufficient to state an Eighth Amendment violation").

Here, the undisputed evidence shows that, unlike in the above cases, Plaintiff was not deprived of his bed and bedding entirely; rather, he had a steel bunk during the day and access to a mattress, two sheets, and a blanket for 6 hours a night during regular sleeping hours. (Doc. 92 ¶¶ 50−52.) In addition, as in *Centeno*, Plaintiff's property restrictions were only for a limited duration that was designed to preserve prison safety and security after Plaintiff repeatedly failed to follow prison rules, not for the wanton and unnecessary infliction of pain. *See Centeno*, 2011 WL 836747, at *3 (finding no showing "that defendants acted for any purpose other than to follow CSW prison procedure and protocol in order to ensure the recovery of the hidden contraband"). Plaintiff has not shown that having access to a mattress and bedding for only 6 hours a night as part of a temporary, 7-day disciplinary sanction, when he continued to have access to showers, food, basic hygiene supplies, and medical care, was "so extreme as to violate contemporary standards of decency and rise to the level of a constitutional deprivation." *Id.* (*See* Doc. 92 ¶¶ 58−61.)

### c.  Personal Hygiene/Sanitation

A complete denial of personal hygiene items violates the Eighth Amendment. *See Keenan*, 83 F.3d at 1089-91 (finding disputed issues of fact where the plaintiff alleged the defendants gave him personal hygiene items only when he could pay for them and that his indigency forced him to choose between hygiene items and legal supplies). And subjecting an inmate to lack of sanitation that is severe or prolonged can rise to a constitutional deprivation. *Anderson v. County of Kern*, 45 F.3d 1310, 1314 (9th Cir. 1995) (no Eighth Amendment violation where inmates were shackled to a grate over a pit toilet for a matter of hours); *see Hutto v. Finney*, 437 U.S. 678, 686-87 (1978) (deprivations that may be tolerable for a few days might become cruel and unusual over longer periods).

Here, there is no dispute that Plaintiff had the opportunity to shave and shower at least three times per week, and he had access to a working toilet. (*See* Doc. 92 ¶¶ 58, 62.) For the first time in his Response, Plaintiff argues in conclusory fashion that he never got

toothpaste or soap; he "didn't brush [his] teeth or use soap the entire week;" and he didn't think "staff was going to go out of their way to get [him] some e[i]ther." (Doc. 101 at 6.) In addition to going beyond the allegations in the TAC or Plaintiff's deposition testimony, these statements are too vague and speculative as to what staff would have provided, if asked, to create a question of material that Plaintiff was deliberately deprived of these basic hygiene supplies.

The only genuine dispute of material fact as to hygiene supplies is whether Plaintiff had access to toilet paper. Taking Plaintiff's assertions in his Deposition testimony as true and construing them in a light most favorable to Plaintiff, Plaintiff only had a partial roll of toilet paper for half a day out of the 7-day period; the COs he spoke to refused to give him toilet paper when he asked, saying they were too busy; and Plaintiff had to clean himself with water. (Doc. 29-1. Ex. B. (Pl. Dep.) at 35:18−22; 36:9−19.)

Based on the relatively short duration of this deprivation and Plaintiff's ability to shower, shave, and clean himself with water, the lack of toilet paper was not a sufficiently prolonged or severe deprivation to constitute a constitutional violation. Additionally, as with Plaintiff's other complaints, even if a reasonable jury could find that the deprivation of toilet paper over 6 1/2 days was sufficiently serious to satisfy the objective component of Plaintiff's claim, there is no evidence that Defendant Griego was aware that Plaintiff lacked toilet paper and thereby acted with deliberate indifference by failing to ensure that the COs provided it to Plaintiff. According to Defendant Griego, SCC policy requires that prisoners on property restriction have access to toilet paper and, even if the toilet paper is taken away due to misuse, they may obtain toilet paper "when necessary." (Griego Decl. ¶ 21.) There is no evidence Defendant Griego was told or had reason to believe that these policies were not being followed in Plaintiff's case from which to infer that Defendant Griego was deliberately indifferent to Plaintiff's need for toilet paper.

### d.     Other Conditions

Plaintiff does not allege any other specific deprivations in the TAC, and Defendants have produced evidence to show that, even though his access to most of his property was

temporarily curtailed, Plaintiff was still given regular meals and access to recreation, medical care, phone calls, library time, visitation, and grievance forms during his 7-day property restriction. Plaintiff once again makes new and vague claims for the first time in his Response that he did not receive "visitation rights phone calls legal or personal or access to (illegible) grievances." (Doc. 101-1 at 1.) Absent any specific facts showing Plaintiff asked for and was denied these things, however, these new assertions fail to raise a triable issue of fact that Plaintiff was deliberately deprived of any remaining non-property related privileges. Moreover, even if Plaintiff could produce additional facts of other deprivations that a reasonable jury would find severe enough to satisfy the objective component of his Eighth Amendment Claim, there is no evidence Defendant Griego was aware of and deliberately disregarded any additional, non-property related deprivations.[6]

In summary, Defendants have carried their initial burden on summary judgment of showing that Plaintiff was not subjected to sufficiently serious deprivations to satisfy the objective component of his Eighth Amendment claim and that, even if he was, Defendant Griego did not know of and deliberately disregard any substantial risks to Plaintiff's health and safety. Although Plaintiff's assertions based on personal knowledge raise some questions of fact bearing on the objective component of his claim, Plaintiff fails to create a genuine issue of material fact that Defendant Griego was aware of any objectively serious deprivations and deliberately disregarded them from which to satisfy the subjective component of his Eighth Amendment claim. Accordingly, the Court will grant Defendants' Motion for Summary Judgment as to Plaintiff's Eighth Amendment claim against Defendant Griego and will dismiss that claim with prejudice.

. . . .

---

[6] To the extent Plaintiff also appears to claim that being placed on property restriction was excessively harsh or punitive to him because of his mental health issues (Doc. 18 at 4), Plaintiff has not put forth any non-conclusory facts or evidence about his mental health that would allow a jury to make this assessment. Absent such evidence, the Court cannot conclude that Plaintiff has raised a genuine issue for trial that his treatment was inhumane due to his mental health.

## C.     Fourteenth Amendment Due Process

### 1.     Legal Standard

In the due process analysis, the Court must first determine whether Plaintiff was entitled to any process, and if so, whether he was denied any constitutionally-required procedural safeguards. Due process is required in the prison context where impositions exceed a prisoner's sentence in such an unexpected manner that the Due Process Clause is directly implicated. *Sandin v. Conner*, 515 U.S. 472, 484 (1995) (citing *Vitek v. Jones*, 445 U.S. 480, 491, (1980) (direct liberty interest in avoiding transfer to a mental hospital); *Washington v. Harper*, 494 U.S. 210, 221-22 (1990) (same for involuntary administration of psychotropic drugs)). But a prisoner may also be entitled to due process protections where the conditions of his confinement "impose[] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484; *Mujahid v. Meyer*, 59 F.3d 931, 932 (9th Cir. 1995).

To determine whether sanctions are atypical and a significant hardship, courts look to (1) the prisoner's conditions of confinement, (2) the duration of the sanction, and (3) whether the sanction will affect the duration of the prisoner's sentence. *See Keenan*, 83 F.3d at 1089. "Atypicality" requires not merely an empirical comparison but turns on the importance of the right taken away from the prisoner. *See, e.g.*, *Sandin*, 515 U.S. at 472 (30 days disciplinary segregation not atypical and significant); *but see Serrano v. Francis*, 345 F.3d 1071, 1078-79 (9th Cir. 2003) (placement of a paralyzed inmate in administrative segregation for two months without access to his wheelchair, a proper shower or toilet, exercise equipment, or other accommodations "worked an atypical and significant hardship on [him] in relation to the ordinary incidents of prison life").

### 2.     Discussion

Defendants argue that the conditions of confinement Plaintiff was subjected to during the 7 days he was on property restriction did not implicate due process protections because they were not sufficiently different from the conditions imposed on segregation inmates not on property restriction. (Doc. 91 at 12.) They argue that Plaintiff still received

regular meals, some clothing, bedding to sleep on, and toilet paper as needed; he also had access to a toilet, sink, and running water; opportunities to shower and shave and participate in recreation; legal, telephone, and visitation access; access to the grievance process; and medical care. (*Id.*) Additionally, the restrictions were only for a short duration and did not result in any actual, measurable physical harm; nor did they lengthen the time of Plaintiff's sentence. (*Id.* at 12−13.)

As to the conditions, the Court has already found that, with the possible exception of the cold, forceful air-flow from the ceiling vent that caused Plaintiff to go under his steel bunk for cover, Plaintiff's deprivations while on property restriction were not objectively sufficiently serious to pose a substantial threat to his health and safety.[7] By the same token, these same conditions—whereby Plaintiff had some clothing; a steel bunk with access to a mattress and bedding for up to six hours a night; access to a working toilet, running water, regular showers, regular meals; and was given the same opportunities for recreation, visitation, library, phone calls, medical, legal, and grievances as all other segregation inmates—do not rise to the level of an "atypical and significant hardship" in the prison context. *Sandin*, 515 U.S. at 484

The duration of this sanction does not call for a different conclusion. Absent more extreme deprivations, the 7-day period of Plaintiff's property restriction was not excessive. *See Hutto*, 437 U.S. at 686–87 ("A filthy, overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months.") It is also much less

---

[7] To the extent a reasonable jury could find that the cold air-flow, combined with having only minimal clothing and semi-available bedding, posed a serious threat to Plaintiff's health or safety, there are no facts showing that the inordinately strong air flow that Plaintiff's allegations imply was a regular and intended component of the property restriction sanction, rather than a separate and inadvertent harm in Plaintiff's particular case. Additionally, the evidence that Plaintiff's entire housing unit was climate controlled at 70 degrees belies that segregation prisoners on property restriction are subjected to severe climate conditions or are treated differently in this respect to other segregation prisoners not on property restriction.

than the 30 days in disciplinary segregation that the Ninth Circuit in *Sandin* found did not implicate due process protections. 515 U.S. at 472.

Finally, Plaintiff does not allege, and there is no evidence from which to conclude, that being placed on property restriction for 7 days will have any bearing on the overall length of Plaintiff's sentence.

Based on these factors, the 7-day sanction Plaintiff received for rule violations did not impose an "atypical and significant hardship on [Plaintiff] in relation to the ordinary incidents of prison life" such that he was entitled to due process protections. *Sandin*, 515 U.S. at 484, 485. ("Discipline by prison officials in response to a wide range of misconduct falls within the expected perimeters (sic) of the sentence imposed by a court of law.").

Accordingly, Plaintiff cannot show that he was deprived of any constitutionally-required procedural safeguards, and the Court will grant Defendants' Motion for Summary Judgment on Plaintiff's Fourteenth Amendment due process claim.

## VI.     Defendant Gilreath's Motion for Summary Judgment

Defendant Gilreath moves for summary judgment based on Plaintiff's failure to exhaust his available administrative remedies before filing suit and on the merits of Plaintiff's Eighth Amendment medical care claims. The Court will address the exhaustion defense before turning to the merits of Plaintiff's claim. *See Albino v. Baca*, 747 F.3d 1162, 1169, 1171 (9th Cir. 2014) (exhaustion should be decided as early as feasible).

### A.     Legal Standard

Under the Prison Litigation Reform Act, a prisoner must exhaust "available" administrative remedies before filing an action in federal court. *See* 42 U.S.C. § 1997e(a); *Vaden v. Summerhill*, 449 F.3d 1047, 1050 (9th Cir. 2006); *Brown v. Valoff*, 422 F.3d 926, 934-35 (9th Cir. 2005). The prisoner must complete the administrative review process in accordance with the applicable rules. *See Woodford v. Ngo*, 548 U.S. 81, 92 (2006). Exhaustion is required for all suits about prison life, *Porter v. Nussle*, 534 U.S. 516, 523 (2002), regardless of the type of relief offered through the administrative process, *Booth v. Churner*, 532 U.S. 731, 741 (2001).

The defendant bears the initial burden to show that there was an available administrative remedy and that the prisoner did not exhaust it. *Albino*, 747 F.3d at 1172; *see Brown*, 422 F.3d at 936-37 (a defendant must demonstrate that applicable relief remained available in the grievance process). Once that showing is made, the burden shifts to the prisoner, who must either demonstrate that he, in fact, exhausted administrative remedies or "come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Albino*, 747 F.3d at 1172. The ultimate burden, however, rests with the defendant. *Id.* Summary judgment is appropriate if the undisputed evidence, viewed in the light most favorable to the prisoner, shows a failure to exhaust. *Id.* at 1166, 1168; *see* Fed. R. Civ. P. 56(a).

If the defendants move for summary judgment for failure to exhaust and the evidence shows that the plaintiff did, in fact, exhaust all available administrative remedies, it is appropriate for the court to grant summary judgment sua sponte for the nonmovant on the issue. *See Albino*, 747 F.3d at 1176 (pro se prisoner did not cross-move for summary judgment on issue of exhaustion, but because he would have succeeded had he made such a motion, sua sponte grant of summary judgment was appropriate).

**B.      Facts Relevant to Exhaustion**

**1.      Plaintiff's Claim**

Plaintiff is a Hawaii inmate who has been incarcerated at SCC, which is owned and operated by CoreCivic, since January 22, 2014. (Doc. 94 (Def.'s Statement of Facts) ¶¶ 1−3.) Defendant V. Gilreath, D.O. is a physician employed by CoreCivic who is licensed to practice medicine in Arizona and who was assigned to work at SCC from January 2016 to January 2018. (*Id.* ¶¶ 5−6.)

On June 7, 2016, Defendant Gilreath examined Plaintiff and reviewed x-rays of Plaintiff's right hand, following Plaintiff's complaints that pins placed to treat an injury to his hand in 2008 needed to be removed, and Defendant Gilreath determined that removal was not medically necessary. (*Id.* ¶¶ 50−53.) Plaintiff's claim against Defendant Gilreath

in Count I stems from Defendant Gilreath's failure to remove the pins, refer Plaintiff to a specialist, or provide any therapy for his hand, even though Plaintiff had only 35 per cent use of his hand, and Defendant Gilreath "was aware of the condition of [Plaintiff's] hand and that [his] hand was becoming worse." (Doc. 18 at 6.)

## 2. CoreCivic's Grievance Policy

CoreCivic Policy 14-5 sets forth the inmate grievance procedures at SCC, which have been in effect since Plaintiff first arrived at SCC on January 22, 2014. (*Id.* ¶¶ 64−65.) Upon arrival at the facility, SCC provides each inmate a copy of the Inmate Handbook, which contains a summary of the grievance policies and procedures in Policy 14-5. (*Id.* ¶ I66; Doc. 94-1 at 13−14.) Inmates also receive verbal instruction on how to use the inmate grievance process from SCC staff during orientation, and copies of SCC's grievance policy and summaries are available to inmates in the library and housing units. (Doc. 94 ¶¶ 68−69.) On January 30, 2014, Plaintiff signed a checklist showing he had received a copy of the Inmate Handbook and verbal instruction on the grievance policy. (Doc. 94 ¶¶ 67, 70; Doc. 94-1 at 16.)

The Inmate Handbook provides that inmates will not be harassed, punished, or disciplined for seeking resolution of legitimate complaints in good faith. (Doc. 94 ¶ 73.) But if an inmate demonstrates a pattern of abuse of the grievance system that causes unnecessary burdens at the expense of legitimate complaints, the Warden or a designee may limit the number of grievances an inmate may file. (*Id.* ¶ 74.) Improperly filed grievances may also be returned without staff review. (*Id.* ¶ 75.)

Pursuant to Policy 14-5, inmates must first attempt to resolve any issues informally by submitting a request for service to the appropriate staff member. (Doc. 94 ¶ 79.) For health care related issues, inmates must submit a Medical Request Form to the Case/Unit Manager, who forwards it to the appropriate staff for a response. (*Id.*) If the inmate is not satisfied with the response, the next step is to submit an Informal Resolution Form (Form 14-5A) with a copy of the Medical Request Form attached. (*Id.* ¶ 80.) Segregation Inmates may submit Form 14-5A to any staff member in their assigned units, and the staff member

then places the form in the grievance box located in the inmate's housing pod in plain view of the inmate. (*Id.*)

All Informal Resolution Forms are directed to the Grievance Coordinator, who assigns each form a number and a case manager to investigate the inmate's claims. (*Id.* ¶ 82.) The Case Manager has 7 days to investigate and another 8 days to return a response to the inmate. (*Id.* ¶ 83.) If the inmate is dissatisfied with the Case Manager's response, he may file a formal grievance by submitting an Inmate/Resident Grievance Form (Form 14-5B) to the Grievance Coordinator within 5 days of the response, and he must attach a copy of the Medical Request Form. (*Id.* ¶¶ 84−86.) These items are placed in a sealed envelope marked "Grievance" and may be placed in the grievance mail box or forwarded to the Grievance Coordinator by a staff member. (*Id.* ¶ 87.)

The Grievance Coordinator checks grievance mailboxes daily, except for weekends and holidays, and staff must give grievances to the Grievance Coordinator. (*Id.* ¶ 88.) The Grievance Coordinator date-stamps and initials all Informal Resolutions and Inmate/Resident Grievances upon receipt. (*Id.* ¶ 89.) All valid Informal Resolutions and Grievances are also assigned a number and logged into the Inmate Grievance Log, and copies are placed in the inmate's grievance file and given to the inmate for his records. (*Id.* ¶ 90.)

The Grievance Coordinator or a designee must investigate and render a decision on the Inmate/Resident Grievance within 15 days of receipt, and if the inmate is unsatisfied with the decision, he has 5 days to submit an appeal to the Warden, after which the Warden or a designee will have 15 days to respond to the appeal. (*Id.* ¶¶ 91−93.) The Warden's decision is final and marks the completion of the grievance process. (*Id.* ¶ 93.)

### 3. Plaintiff's Grievances

Defendant submits copies of Plaintiff's relevant grievances and the declaration of SCC Grievance Coordinator, J. Valenzuela, who searched Plaintiff's grievance file and determined that Plaintiff filed the following grievances about his hand since his arrival at SCC. (*See* Doc. 94-1, Ex. A (Valenzuela Decl.) ¶¶ 1, 46; Doc. 94-1, Ex. 1-D.)

On March 10, 2016 Plaintiff submitted a Medical Request, in which he stated that he was in pain and had to have the pins in his hand taken out, to which staff responded on March 11, 2016 that an appointment had been made with the Nurse. (Doc. 94-1 at 25.)

On April 3, 2016, Plaintiff filed another Medical Request, stating that he had to have pins taken out of his hand and his hand was hurting. (*Id.* at 22.) The staff response to this request, dated April 4, 2016, states "you have an appt (illegible) with Doctor for physical." (*Id.*)

On April 25, 2016, Plaintiff filed an Informal Resolution, No. 16-04-13, in which he stated that he was "not happy" with this response and "I need to get these pins taken out of my hand[.] They took my x Ray." (*Id.* at 20.) The "Staff Response" portion of this Informal Resolution, dated May 2, 2016, states, in part, "Your recent x ray shows wires in place. You have been evaluated multiple times by different providers. Ortho consult was denied by Hawaii in Feb last year. Provider reports no loss of grasping ability" and "Per provider 'even if hardware removed, bump on top of wrist will not go away.'" (*Id.* at 21.)

On April 29, 2016, 4 days prior to the above response, Plaintiff filed another Informal Resolution, No. 16-04-20, dated January 1, 2016,[8] in which he stated that he had four pins in his hand from an operation before he got arrested on his charges, and he had tried to live with them, "but the pain is to[o] great" to believe what the prison medical unit doctor told him, which was that "the pins have been there for to[o] long" and removing them would require a "trip to the ER which has been denied." (Doc. 94-1 at 24.) Plaintiff stated that the pins had to be removed and he "can['']t do push up ect (sic) without feeling sharp pain in [his] hand." (*Id.*) This Informal Resolution was marked as a "duplicate" and the "Staff Response" section states "this issue was addressed on informal resolution received 4-25-16." (*Id.* at 26.)

---

[8] Defendant does not state whether this Informal Resolution had been previously filed or otherwise explain why it was dated January 1, 2016.

Plaintiff did not submit any Inmate/Resident Grievances related to Informal Resolutions 16-04-13 and 16-04-20; Plaintiff only submitted one Formal Grievance since his arrival at SCC, and it was not related to the pins in his hand. (Valenzuela Decl. ¶ 48.)

Plaintiff was placed on Grievance Restriction from July 6, 2016 to December 7, 2016 for filing duplicative and frivolous grievances that hindered the Grievance and Medical Departments. (Doc. 94 ¶ 114.) These included, but were not limited to, Informal Resolutions 16-04-13 and 16-04-20. (*Id.*) During his period on Grievance Restriction, Plaintiff was still permitted to submit two grievances at a time. (Valenzuela Decl. ¶ 53.)

### 4. Discussion

Defendant Gilreath argues that Plaintiff failed to exhaust his administrative remedies as to his medical care claim because, during the time Plaintiff was at SCC, he only submitted two Informal Resolutions related to the pins in his right hand on April 25 and 29, 2016, neither of which was related to the care he received from Defendant Gilreath on June 7, 2016, and Plaintiff never submitted any Inmate/Resident Grievances regarding the pins in his hand or Defendant Gilreath's treatment of Plaintiff.

Based on these facts and the additional facts regarding the availability of SCC's grievance process to Plaintiff, Defendant Gilreath has met his initial burden of showing that SCC had a grievance process that was available to Plaintiff at the relevant time of his alleged injuries and Plaintiff failed to exhaust his administrative remedies with respect to his medical care claim against Defendant Gilreath. Plaintiff must therefore produce evidence to show either that he did, in fact, exhaust his administrative remedies or that he was effectively prevented from doing so.

Plaintiff admits that he did not exhaust his administrative remedies. On the form Complaint, Plaintiff marked that (1) administrative remedies were available at SCC, (2) he submitted a request for administrative relief as to his claim against Defendant Gilreath in Count I, and (3) he did not appeal his request for relief to the highest level. (Doc. 18 at 3.)

In explanation, Plaintiff wrote "I was placed on grievance restriction a policy in place at [SCC]." (*Id.*) Plaintiff does not explain in his Response, however, how being on

grievance restriction prevented him from completing the grievance process with respect to his claim against Defendant Gilreath, particularly where the evidence shows that, while on grievance restriction, Plaintiff was still permitted to file two grievances at a time. (*See* Valenzuela Decl. ¶ 53.) Absent additional facts showing how this restriction effectively prevented Plaintiff from grieving his medical care complaints against Defendant Gilreath, Plaintiff has not shown that the grievance process was effectively unavailable to him such that his failure to exhaust his administrative remedies should be excused.

Plaintiff also argues in his Response, in contrast to his assertions in the TAC, that he did, in fact, exhaust his administrative remedies as to his claim against Defendant Gilreath in Count I. (Doc. 102 at 4.) But he makes only vague claims about what he "bel[i]eve[s]" he filed and the answers he received. (*Id.*) He states that "the final faze (sic) of the grievance was answered by Warden Taylor . . . before Warden Thomas came back from Texas and replaced Taylor sometime in Sept 2016." (*Id.*) These unsupported assertions are both in conflict with Plaintiff's representations in the TAC and too vague to show what issue(s) Plaintiff grieved and when to show that he exhausted his administrative grievances with respect to his medical care claim against Defendant Gilreath.

Plaintiff also claims that he submitted copies of the grievances he completed to the highest level when he filed his original Complaint, so these grievances "should already be in the Court's possession." (*Id.* at 6.) It is not the Court's role to pour through the record to find evidence to oppose summary judgment; rather, as explained in the Court's *Rand* Notices to Plaintiff, Plaintiff must cite to "the specific admissible portion of the record supporting [his] position. (Docs. 96 & 98 at 2 (citing LRCiv 56.1(b)).

Due to Plaintiff's pro se status, the Court has, nonetheless, made an attempt to identify any final grievances in the more than 60 pages of statements and other documents Plaintiff appended—without citation—to his original Complaint. This evidence shows that Plaintiff filed numerous and frequent Medical Requests; three Inmate/Resident Grievances and an Appeal regarding wanting to see the eye doctor (Doc. 1 at 40, 45, 49; Doc. 1-1 at 15.); one undated Inmate/Resident Grievance regarding wanting the "hardware" removed

from his hand (Doc. 1-1 at 11−12); and on June 6, 2016, he was issued an Excessive Filing Restriction, limiting him to submitting only two Grievances/Informal Resolutions at a time, and stating that "[o]nce the issues have been completed you may file another two (2) more." (Doc. 1-1 at 20.) There is no evidence in these attachments, as Plaintiff suggests, that he appealed any grievances related to the treatment of his hand to the highest level.

Because Defendant Gilreath has met his burden of showing that SCC had an administrative grievance process available to Plaintiff and Plaintiff failed to exhaust his administrative remedies, and Plaintiff fails to create a genuine issue of material fact either that he, in fact, exhausted those remedies or the grievance process was effectively unavailable to him, the Court will grant Defendant Gilreath's Motion for Summary Judgment on non-exhaustion grounds and will dismiss Count I.

Due to this dismissal, the Court need not discuss the merits of Plaintiff's medical care claim against Defendant Gilreath. The Court will also dismiss as moot Plaintiff's Motion for Copies and Motion for Extension, both of which pertain solely to requests to help Plaintiff more fully develop the merits of this claim. (*See* Doc. 165 ¶¶ 2−5; Doc. 167 ¶¶ 4−5.)

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is **withdrawn** as to Defendants Thomas and Griego's Motion for Summary Judgment on Counts II and III (Doc. 91), Defendant Gilreath's Motion for Summary Judgment on Count I (Doc. 93); Plaintiff's "Motion to Have Copys (sic) Made of the Grievances Submitted to the Court and Forwarded to the Arizona Medical Board" (Doc. 165); and Plaintiff's "Motion for an Extension of Time Before Any Judgment is Made on Summary Jud[g]ement" (Doc. 167).

(2)     Magistrate Judge Eileen S. Willett's Report and Recommendation (Doc. 86) is **adopted**; Defendant Beard is **dismissed** without prejudice for lack of service.

(3)     Defendants Thomas and Griego's Motion for Summary Judgment on Counts II and III (Doc. 91) is **granted**, and these claims and Defendants are **dismissed** with prejudice.

(4)     Defendant Gilreath's Motion for Summary Judgment on Count I (Doc. 93) is **granted**, and Plaintiff's claim in Count I and Defendant Gilreath are **dismissed** without prejudice for failure to exhaust available administrative remedies.

(5)     Plaintiff's "Motion to Have Copys (sic) Made of the Grievances Submitted to the Court and Forwarded to the Arizona Medical Board" (Doc. 165) and "Motion for an Extension of Time Before Any Judgment is Made on Summary Jud[g]ement" (Doc. 167) are **denied** as moot.

(6)     Defendants' Motion to Strike (Doc. 172) is denied as moot.

(7)     There being no claims remaining, the Clerk of Court must enter judgment accordingly and terminate this action.

Dated this 18th day of March, 2019.

Honorable John J. Tuchi
United States District Judge